IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

UNITED STATES OF AMERICA,

v.                                    CRIMINAL ACTION NO. 2:19-cr-00178

BROOKE ALEXANDRIA KIMBLE

OPINION

**Further Explanation of Reasons and Sentencing Issues**

## I.  Introduction

On September 29, 2020, Defendant Brooke Alexandria Kimble appeared before me for a sentencing hearing. I had previously accepted her plea of guilty to Distribution of a Quantity of Fentanyl, a Schedule II Controlled Substance in violation of 21 U.S.C. § 841(a)(1), as charged in Count One of the Indictment filed against her. However, I had deferred acceptance of the plea agreement until sentencing. Accepting this plea agreement would have required me to impose a sentence within the range of 120 to 180 months in prison. At that point, Defendant's advisory Guidelines range had been calculated to be 168 to 210 months. Defendant sought a downward variance to a sentence of 120 months.

At her first sentencing hearing, I found that Defendant's advisory Guidelines range had been improperly calculated and rejected the proffered plea agreement.

Defendant requested more time to decide whether to continue with her plea before I imposed a sentence.

She then persisted in her plea to Count One and I accepted a second plea of guilty on October 22, 2020, this time to Distribution of a Quantity of Fentanyl, a Schedule II Controlled Substance in violation of 21 U.S.C. § 841(a)(1), as charged in Count Two of the Indictment filed against her. At her second sentencing hearing, held on October 29, 2020, I calculated Defendant's advisory guideline range and made two notable findings:

> (1) the death of Mr. Lawson is not attributable to the offense of conviction— giving Defendant a base offense level of 12 rather than 38; and

> (2) the death was a result of relevant conduct—depriving Defendant of the two-level reduction safety valve described in United States Sentencing Guideline § 2D1.1(b)(18), which would have made her Guidelines range 0 to 6 months of imprisonment.

I then imposed a sentence of 60 months to be followed by 3 years of supervised release, a significant upward variance from her advisory Guidelines range. I now publish this opinion to further explain and preserve my reasons for rejecting the plea agreement and for my significant variance when imposing a sentence.

## II. Background

### a. January 5, 2019

On January 5, 2019, Ginger Cunningham and her fiancé, Frederick Lawson, both heroin users, wanted to get high. Because Mr. Lawson was on home confinement, Ms. Cunningham contacted Defendant and arranged to purchase two doses of heroin. She purchased the heroin and brought it back to the home she shared

with Mr. Lawson. Both injected themselves with the drugs. Mr. Lawson then passed out for several hours. When he eventually woke, he insisted that Ms. Cunningham purchase an additional two doses of heroin.

Ms. Cunningham again contacted Defendant and arranged to purchase the additional doses of heroin. She went to Defendant's home, purchased the doses and returned back to her and Mr. Lawson's residence. Again, they both injected themselves with the drugs. But this time, Mr. Lawson almost immediately quit breathing. According to Ms. Cunningham, this was not the first time that Mr. Lawson had "died" on her.

Ms. Cunningham attempted CPR and contacted Mr. Lawson's mother, asking her to bring over Narcan as quickly as possible. Mr. Lawson's mother arrived soon after, but the Narcan was not able to revive him. At this point, Ms. Cunningham finally called 9-1-1. Unfortunately, this was to no avail and Mr. Lawson died that evening. Lab results determined that the cause of Mr. Lawson's death was fentanyl intoxication. The drugs that Mr. Lawson and Ms. Cunningham—and by all accounts, Defendant as well—believed to be heroin were actually fentanyl.

After Mr. Lawson's death, Ms. Cunningham was interviewed by the Parkersburg Police Department. In telling her story, Ms. Cunningham identified Defendant as the source of the drugs that Mr. Lawson took that day.

### b.  January 7, 2019

On January 7, 2019, in conjunction with the Parkersburg Police Department, Ms. Cunningham contacted Defendant and arranged to purchase heroin. Wearing a recording device, Ms. Cunningham went to Defendant's home and purchased a dose of heroin. While purchasing the drugs, Ms. Cunningham asked Defendant "is this the

same stuff that killed [Mr. Lawson]?" Defendant replied that it was and told Ms. Cunningham to be "be careful" because she did not want Ms. Cunningham to die as well.

Lab tests would reveal that this "heroin" was actually .0556 grams of fentanyl.

### c.  January 8, 2019

On January 8, 2019, again in conjunction with the Parkersburg Police Department, Ms. Cunningham contacted Defendant and arranged to purchase heroin. Ms. Cunningham once again went to Defendant's home and purchased the drugs.

Lab tests would reveal that this "heroin" was actually .0715 grams of fentanyl.

### d.  July 19, 2019

On July 19, 2019, a federal grand jury returned a two-count indictment against Defendant. Both counts charge her with distribution of a quantity of fentanyl in violation of 21 U.S.C. § 841(a)(1). Count One of the Indictment related to the controlled buy on January 7, 2019. Count Two of the Indictment related to the controlled buy on January 8, 2019. Defendant was never indicted for either the sale of drugs on January 5, 2019, or for Mr. Lawson's death.

### e.  Defendant's First Plea Hearing

A plea hearing was scheduled and held on October 31, 2019, per the Government's Motion to Schedule a Plea Hearing. [ECF No. 25]. At this hearing, Defendant and the Government presented a plea agreement that they had entered into. Per the terms of this plea agreement, Defendant would plead guilty to Count One of the Indictment and Count Two would be dismissed.

The Plea Agreement was an 11(c)(1)(C) Plea Agreement, also known as a binding plea agreement. In a binding plea agreement, a defendant and the Government agree to a sentence or sentencing range. If the court accepts this plea agreement, then the court is bound to enter the agreed to sentence or a sentence from within the agreed upon range.[1] The Plea Agreement, entered into by Defendant and the Government on October 18, 2019, agreed to a sentencing range of 120 to 180 months of imprisonment. At the plea hearing, after advising Defendant of her rights and the penalties she might face, I accepted her plea of guilty to Count One. I deferred acceptance of the plea agreement until sentencing.

At the end of this hearing, I directed the United States Probation Office to prepare a Presentence Investigation Report.

### f.  Defendant's First Sentencing Hearing

After several continuances, some due to the COVID-19 pandemic, Defendant appeared before me to be sentenced on September 29, 2020. The Probation Officer's Presentence Investigation Report advised that the Guidelines range for Defendant's sentence was 168 to 210 months. The plea agreement would have required me to impose a sentence within the range of 120 to 180 months. In her sentencing memorandum, Defendant moved for a downward variance from the Guidelines range. She sought a sentence of 120 months—the bottom of the range agreed to in the plea agreement.

Before sentencing Defendant, I heard argument from Defendant and the Government about why I should accept the plea agreement. In urging me to accept the plea agreement, the Government argued that it was trying to find a "middle

---

[1] Fed. R. Crim. P. 11(c)(1)(C).

ground" between three possible outcomes: (1) a 20-year statutory minimum that would result if Defendant was convicted of distribution of a controlled substance resulting in a death under 21 U.S.C. § 841(b); (2) a 0 to 6 months Guidelines range; and (3) a 168 to 210 months Guidelines range. The Government offered that it arrived at the agreed upon range of 120 to 180 months after considering Defendant's age and lack of criminal history. The Government asserted that it believed that if Defendant was charged with Mr. Lawson's death, it had enough evidence to convict her and she would face the statutory 20-year minimum term of imprisonment.

Defendant offered that the shadow hanging over the negotiation was the 20-year minimum that Defendant would face if she were indicted for and convicted of the sale resulting in death. Defendant argued that the language of 841(b) makes the 20-year minimum easy to invoke and that she did not want to risk the possibility of 20 years in prison. Defendant stated that the Government's first offer was a sentence of 15 years, and that the two parties went back and forth several times before arriving at 120 to 180 months. In urging me to accept the plea agreement, Defendant offered "it is kind of like a civil mediation to me, your Honor; when nobody's happy with it, that's probably the right decision. It's worked out the right way." [ECF No. 47, at 13:8–11].

In their argument, both parties credited opposing counsel for operating in good faith in an effort to avoid a sentence of 20 years. For reasons discussed at length below, *see infra* Part III, I ultimately found the reasons offered encouraging me to accept the plea agreement to be uncompelling and rejected the plea agreement. Defendant requested more time to decide whether to continue with her plea. I

continued the sentencing until October 29, 2020, until after Count Two of the indictment was resolved.

### g.  Defendant's Second Plea Hearing

A plea hearing was scheduled for October 22, 2020, per the Government's Motion to Schedule a Plea Hearing for Count Two of the Indictment. [ECF No. 48]. This time, there was no plea agreement. After advising Defendant of her rights and the penalties that she could face, I accepted her plea of guilty to Count Two of the Indictment. I ordered Probation to prepare an Amended Presentence Investigation Report and scheduled a Sentencing Hearing for October 29, 2020. At this point, Defendant stood convicted of Counts One and Two of the Indictment.

### h.  Defendant's Second Sentencing Hearing

Defendant appeared before me for sentencing for her convictions for Counts One and Two of the Indictment on October 29, 2020. For reasons discussed at length below, *see infra* Part IV, I imposed a sentence of 60 months of imprisonment to be followed by 3 years of supervised release. Defendant was remanded to the custody of the United States Marshal.

## III.   The Plea Agreement

Rule 11 of the Federal Rules of Criminal Procedure grants a district judge the power to accept or reject a plea agreement.[2] The court enjoys "broad discretion . . . when choosing to accept or reject plea agreements"[3] and "is not obligated to accept

---

[2] Fed. R. Crim. P. 11(c). Congress, by virtue of the Rules Enabling Act and adoption of the Federal Rules of Criminal Procedure, has sanctioned the judge's power to accept or reject a plea agreement. *See* 28 U.S.C. § 2072; *see also* 1 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2 (4th ed. 2017) ("Congress . . . always retains the authority to approve, disapprove, or modify any proposed new rules or rule changes.").
[3] *In re Morgan*, 506 F.3d 705, 708 (9th Cir. 2007).

any recommendation or bargain reached by the parties."[4] However, a plea agreement may agree on "a specific sentence or sentencing range" and that agreement "binds the court once the court accepts the plea agreement."[5] The Advisory Committee Notes to Rule 11 expressly state: "The plea agreement procedure does not attempt to define criteria for the acceptance or rejection of a plea agreement. Such a decision is left to the discretion of the individual trial judge."[6] Other than granting the court broad discretion to accept or reject a plea agreement, Rule 11 provides no further guidance for the court. If the defendant and the Government have agreed to a sentence outside of the applicable Guidelines range, the court may not accept the agreement unless the agreed upon sentence is outside the applicable Guidelines range "for justifiable reasons; and those reasons are set forth with specificity."[7]

I have previously rejected plea agreements when I determined that they were not in the public interest.[8] In *Stevenson*, I found that I should give great weight to the people's interest in participating in their criminal justice system when considering whether to accept or reject a proffered plea agreement.[9] Therefore, in each case, I consider case-specific factors offered by the parties and determine whether those case-specific factors are sufficiently compelling to overcome the people's participatory interest.[10]

---

[4] *United States v. Dixon*, 504 F.2d 69, 72 (3rd Cir. 1974).
[5] *Fed. R. Crim. P.* 11(c)(1)(C).
[6] *Fed. R. Crim. P.* 11 advisory committee's note to 1974 amendments.
[7] *Hughes v. United States*, 138 S. Ct. 1765, 1773 (2018).
[8] *See United States v. Walker*, 423 F. Supp. 3d 281 (S.D. W. Va. 2017); *United States v. Wilmore*, 282 F. Supp. 3d 937 (S.D. W. Va. 2017); *United States v. Stevenson*, 425 F. Supp. 3d 647 (S.D. W. Va. 2018).
[9] *Stevenson*, 425 F. Supp. 3d at 648.
[9] *See id.*

As I have previously explained in *Stevenson*, *Wilmore*, and *Walker*, I am of the opinion that plea bargaining has led to the disregard of the constitutional requirement that serious crimes be charged only by grand jury indictment. This concern was paramount in my rejection of the plea agreement in this case. The Fifth Amendment to the Constitution ensures that "No person shall be held to answer for a capital, or otherwise infamous crime, unless on presentment or indictment of a Grand Jury."[11] As I will explain, this plea agreement intended to hold Defendant to answer for, and asked me to sentence her for, an offense that has not been charged by a grand jury—the death of Mr. Lawson.

As noted above, Defendant has been charged with two counts of distribution of a quantity of fentanyl in violation of 21 U.S.C. § 841(a)(1). Count One charges her with distributing 0.0556 grams of fentanyl, and Count Two charges her with distributing 0.0715 grams, for a total of 0.1271 grams. For comparison, one gram of salt is only about 1/6 of a teaspoon. This amount of fentanyl is only 1/10 of that. For distributing this amount of fentanyl, which Defendant thought was heroin, the plea agreement would have required me to sentence her to a minimum of 120 months in prison.

### a. The Guidelines Range

In determining whether this plea agreement was even reasonable, I began by calculating the applicable advisory Guidelines range using the United States Sentencing Commission's Guidelines Manual ("Guidelines"). In my calculations, I made two findings that substantially affected the Guidelines calculation: (1) the death of Mr. Lawson is not attributable to the offense of conviction—giving Defendant

---

[11] U.S. Const. amend. V.

a base offense level of 12 rather than 38; and (2) the death of Mr. Lawson was a result of relevant conduct—depriving Defendant of the two-level reduction safety valve under U.S.S.G. § 2D1.1(b)(18).

According to the Original Presentence Investigation Report ("Original Sentencing Report") which was prepared by the United States Probation Office on January 9, 2020, Defendant's base offense level should have been 38 pursuant to U.S.S.G. § 2D1.1(a)(2). Section 2D1.1(a)(2) states, in part, that the base offense level is 38 if "the offense of conviction establishes that death or serious bodily injury resulted from the use of the substance." U.S.S.G. § 2D1.1(a)(2). The Original Sentencing Report used this Guideline for the base offense level because it concluded that the death of Mr. Lawson was "relevant conduct."

Ultimately, after reductions for acceptance of responsibility, the Original Sentencing Report concluded that Defendant's total offense level was 35. Because Defendant had no other criminal history, she had a criminal history category of I. An offense level of 35 and criminal history category of I produce an advisory Guidelines range of 168 to 210 months.

The statutory maximum term of imprisonment in this case is 20 years, or 240 months. Thus, if the Original Sentencing Report had been correct, the plea agreement of 120 to 180 months may have looked reasonable. However, I found that the Original Sentencing Report misapplied U.S.S.G. § 2D1.1(a)(2), and that Defendant's Guidelines range was, in fact, substantially lower.

### i.   Mr. Lawson's Death

U.S.S.G. § 2D1.1(a)(2) requires a base offense level of 38 only when "the *offense of conviction* establishes that death or serious bodily injury resulted from the use of

the substance." The Guidelines do not specifically define "offense of conviction" as a term of art, but they do provide useful context. Comment 1(I) of § 1B1.1 defines the term "offense" as "the offense of conviction *and* all relevant conduct."[12] Section 1B1.2(a) defines the offense of conviction as "the offense conduct charged in the count of the indictment or information of which the defendant was convicted."[13] Therefore, it is clear that when the Guidelines refer only to the "offense of conviction," they are referring to something narrower than the "offense." That is, the offense of conviction is exactly that—the offense of which the defendant stands convicted. It is not and does not include any other relevant conduct.

I recognize that U.S.S.G. § 1B1.3(a) instructs that "Unless otherwise specified, the base offense level where the guideline specifies more than one offense level . . . shall be determined" pursuant to the provisions regarding relevant conduct and expanded relevant conduct under § 1B1.1(a). However, based on the Guidelines definition of "offense" as something more broad than only the "offense of conviction," I find that when a guideline specifically applies to only the "offense of conviction," it is "otherwise specified" that relevant conduct is not to be taken into account. Other courts agree. *See United States v. Lawler*, 818 F.3d 281, 284 (7th Cir. 2016) ("§ 2D1.1(a)(2) applies only when a resulting death (or serious bodily injury) was an element of the crime of conviction, proven beyond a reasonable doubt or admitted by the defendant); *see also United States v. Greenough*, 669 F.3d 567, 573–75 (5th Cir.

---

[12] U.S.S.G. § 1B1.1 cmt. n.1(I).

[13] This same definition is used in the Application Notes for U.S.S.G. § 1B1.11. Application Note 6 of U.S.S.G. § 2B1.5 also distinguishes between the offense of conviction and relevant conduct by defining the offense as "the instant offense of conviction and all relevant conduct under § 1B1.3."

2012); *United States v. Aquino,* 555 F.3d 124, 129 (3d Cir. 2009); *United States v. Blackwell,* 323 F.3d 1256, 1260 (10th Cir. 2003).

Under this reading of the Guidelines, there are three different types of conduct with different definitions that are at issue in this case: (1) the offense of conviction, (2) relevant conduct, and (3) the offense.

The offense of conviction is the narrowest of these three types of conduct. It is the conduct that makes up the elements of the offense for which the defendant has been convicted as charged in an indictment or information. To be clear, this would not include conduct that makes up the elements of an offense for which the defendant has been merely indicted.

Relevant conduct, the second type of conduct at issue in this case, is more inclusive than the offense of conviction. Relevant conduct is all the conduct that can be considered in calculating the Guidelines range. A sentencing judge may consider "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant . . . that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense."[14] And, as here, in an offense involving distribution of a controlled substance,[15] the sentencing judge may consider as relevant conduct "all acts and omissions described . . . above that were part of the same course of conduct or common scheme or plan as the offense of conviction."[16] The sentencing judge may also consider "all harm that resulted from

---

[14] U.S.S.G. § 1B1.3(a)(1)(A).

[15] An "offense of a character for which § 3D1.2(d) would require grouping of multiple counts." U.S.S.G. § 1B1.3(a)(2).

[16] *Id.*

the acts and omissions . . . above, and all harm that was the object of such acts and omissions."[17]

The term "offense" is the broadest category of conduct at issue in this case. The offense is the combination of both the offense of conviction and the relevant conduct. To put it simply, Offense = Offense of Conviction + Relevant Conduct.

For example, consider the hypothetical defendant from Application Note 14(e) of U.S.S.G. § 2K2.1. That defendant is unlawfully in possession of both a shotgun and a handgun. He uses the handgun to rob a store and kills the store clerk.

Sentencing for the offense of unlawfully possessing the shotgun is governed by U.S.S.G. § 2K2.1. Section 2K2.1(b)(6) says that if the defendant "used or possessed any firearm or ammunition in connection with another felony offense" (like a robbery), increase the offense level by four levels. Section 2K2.1(c)(1) provides that if "the defendant uses or possessed any firearm or ammunition cited in the *offense of conviction* in connection with commission or attempted commission of another offense . . . apply, if death resulted, the most analogous offense guideline from" the Guidelines provisions for homicide in U.S.S.G. § 2A1.1.

If the hypothetical defendant was indicted for and later convicted of unlawfully possessing the shotgun but the indictment included no mention of the handgun, the robbery, or the death, then the offense of conviction would include only the unlawful possession of the shotgun. The possession of the handgun, the robbery, and the death would be relevant conduct. The most broadly defined offense would include the possession of the shotgun, the handgun, the robbery, and the death. In this scenario, the defendant's offense level could be increased by four levels under U.S.S.G.

---

[17] U.S.S.G. § 1B1.3(a)(3).

§ 2K2.1(b)(6) because a firearm was used in connection with another felony offense, but the homicide Guidelines could not be applied under U.S.S.G. § 2K2.1(c)(1) because the handgun was not cited in the offense of conviction.

The distinction between these three categories of conduct is significant in Defendant's case because if a death resulted from the offense of conviction, then the base offense level under the Guidelines is increased from 12 to 38. If the death resulted from relevant conduct, then the base offense level is not increased. Defendant's offenses of conviction are Counts One and Two of the Indictment—distributions of a quantity of fentanyl in violation of 21 U.S.C. § 841(a)(1) taking place on January 7 and 8, 2019, respectively.[18] Not only do the elements of those offenses not establish that a death resulted from the use of the substance, but it is in fact undisputed that Mr. Lawson's death did not occur as a result of the fentanyl that Defendant distributed on January 7 and 8, as those distributions were days after Mr. Lawson died on January 5. Therefore, even if Mr. Lawson's death is relevant conduct, I could not find that Guidelines § 2D1.1(a)(2)—which would increase the base offense level to 38—applies because Mr. Lawson's death cannot be connected to the offense of conviction.

However, I did **FIND** that the death of Mr. Lawson was attributable to Defendant's relevant conduct. Mr. Lawson died on January 5, 2019, after twice injecting himself with fentanyl provided by Defendant. The drugs that Defendant sold to Ms. Cunningham on January 5 were, by her own admission, the same drugs that she later sold to Ms. Cunningham during the controlled buys on January 7 and 8. The

---

[18] At the time I rejected the plea agreement, Defendant stood convicted of only Count One, as charged in the Indictment.

sale of drugs on January 5 was clearly part of the same course of conduct as the sale of drugs on January 7 and 8, and I found by a preponderance of the evidence that the death of Mr. Lawson resulted from that same course of conduct.

### ii. The Proper Calculation of Defendant's offense level

The appropriate calculation of Defendant's base offense level, then, is based only on the drug weight attributable to her under U.S.S.G. § 2D1.1(a)(5). Per the drug quantity table, distribution of 0.1271 grams of fentanyl results in a base offense level of 12.[19] At the time I was making this calculation, it was possible that Defendant would also be eligible for a two-level reduction under § 2D1.1(b)(18) and an additional two-level reduction for acceptance of responsibility under § 3E1.1(a).

Section 2D1.1(b)(18) requires a two-level reduction if a defendant meets all the requirements of U.S.S.G. § 5C1.2(a)(1)–(5). This is referred to as the "safety valve." Importantly, U.S.S.G. § 5C1.2(a)(3) says that this two-level reduction applies only if "the offense did not result in death or serious bodily injury to any person." Because I have found that "offense" includes both "the offense of conviction" and "relevant conduct," the safety valve reduction does not apply when a sentencing judge has found by a preponderance of the evidence that a defendant's relevant conduct resulted in death or serious bodily injury. In this case, I found by a preponderance of the evidence that Defendant's relevant conduct, the sale of drugs on January 5, 2019, caused Mr. Lawsons' death. Therefore, the two-level safety valve reduction should not apply in this case and Defendant's base offense level should be 10, which would create an advisory Guidelines range of 6 to 12 months.

---

[19] U.S.S.G. § 2D1.1(c)(14).

However, at Defendant's Second Sentencing hearing, both Defendant and the Government agreed that the two-level safety valve reduction should apply. Because I ultimately varied substantially upward when imposing my sentence, I find it unnecessary to recalculate Defendant's advisory Guidelines range, but I write to clarify now that because I found Mr. Lawson's death to be a result of Defendant's relevant conduct, if I were to recalculate her advisory Guidelines range, the two-level reduction required by § 2D1.1(b)(18) would not apply.

Therefore, applying the safety valve as I did at the hearing, Defendant's total offense level was 8.[20] With an offense level of 8 and a criminal history category of I, the advisory Guidelines range was 0 to 6 months.[21] Without the safety valve, Defendant's total offense level would have been 10. With an offense level of 12 and a criminal history category of I, the advisory Guidelines range would be 6 to 12 months. It goes without saying that both of these advisory ranges are substantially lower than the 168 to 210 months in the Original Sentencing Report and the 120 to 180 months agreed to in the plea agreement.

Upon reviewing the sentencing memorandum filed by Defendant, it appears that the parties were aware that Defendant's Guidelines range should be this low before entering into an agreement of 120 to 180 months. This drastic discrepancy makes little sense on its face. Why would Defendant agree to a minimum sentence nine years higher than her Guidelines range? The sentencing memoranda and Original Sentencing Report indicate this agreement was entered into based on the Government's threat that it would—or at least could—have charged Defendant with

---

[20] This includes a two-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(a).
[21] U.S.S.G. Ch. 5, Pt. A.

the offense of distribution of a controlled substance resulting in death, an offense which, if convicted, would subject Defendant to a 20-year statutory minimum sentence.[22]

### b. Rejecting the Plea Agreement

This brings me back to where I began with the Fifth Amendment. Though the Government has complete discretion in whether and when to bring charges before a grand jury, I cannot permit the Government to hold Defendant to answer for an offense which has not been charged by a grand jury. And in this case, the threat of the distribution causing death offense was just that—a threat. It had not been charged. In essence, it seemed I was being asked to punish Defendant for the offense of distribution causing death, at half the statutory minimum in exchange for her agreement to plead guilty to distribution under 21 U.S.C. § 841(a)(1). I refuse to be part of such a game.

While the death of Mr. Lawson is relevant conduct to the offenses of conviction,[23] I could not authorize a sentence in the agreed upon range of 120 to 180 months unless the sentence was supported by the factors identified in 18 U.S.C. § 3553(a). While the offense of conviction, and the relevant conduct, are certainly serious here, I could not find that they would justify an upward variance of at least nine years—especially given Defendant's lack of criminal history, her personal history and characteristics, and the extremely small quantity of drugs actually attributed to her. Further, as Defendant pointed out in her sentencing memorandum, she has not admitted to all of the elements of distribution causing death. Instead, she

---

[22] 21 U.S.C. § 841(b)(1)(C).
[23] I found at the Second Sentencing Hearing that Defendant's conduct on January 5, 2019, more likely than not caused Mr. Lawson's death. [Transcript 89:7–11].

has only admitted that she sold what she believed to be heroin to Ms. Cunningham for Mr. Lawson on January 5, 2019; that Mr. Lawson died later that day; and that according to the post mortem examination report, the cause of death was fentanyl poisoning. She maintains that she has not admitted that the drugs she sold on January 5, 2019, caused Mr. Lawson's death.

This plea agreement asked me to be complicit in the Government's attempt to hold Defendant accountable for uncharged conduct. Alternatively, it asked me to find that unadmitted conduct is sufficient to justify a nine-year upward variance, even in light of several substantially mitigating factors. I found that either alternative was unreasonable. If the Government wanted Defendant sentenced for the death of Mr. Lawson, the Fifth Amendment requires the Government to present the facts of the case to a grand jury, the public's representative in the criminal prosecution process. I recognize that the Government and Defendant were working to avoid a statutory minimum of 20 years of imprisonment, but I could not accept the method by which they attempted to circumvent the 20 years. By trying to avoid a 20-year minimum and asking me to impose at least 10 years as punishment for a crime when the applicable Guidelines range is 0 to 6 months, the parties attempted to drag me into a plea negotiation process in which I am forbidden from participating. At bottom, none of the reasons provided by either party justified a sentencing range so far outside of the advisory Guidelines range.[24] Therefore, I rejected the plea agreement.

## IV. Imposing a Sentence

After I rejected the plea agreement, Defendant pleaded guilty to Count Two of the Indictment filed against her. Sentencing proceeded on October 29, 2020. At that

---

[24] *Hughes v. United* States, 138 S. Ct. 1765, 1773 (2018).

time, Defendant stood convicted of two counts of distribution of Fentanyl in violation of 21 U.S.C. § 841(a)(1) as charged in Counts One and Two of the Indictment filed against her.

Before imposing a sentence, the law requires me to properly calculate the defendant's Guidelines range.[25] However, this Guidelines range is merely advisory and I am not bound to impose a sentence from within that range.[26] As explained above, I calculated Defendant's Guidelines range to be 0 to 6 months.

A sentencing judge is empowered to vary downward or upward from the advisory Guidelines range at their discretion.[27] And I ultimately did vary upward, sentencing Defendant to a term of 60 months of imprisonment, 44 months more than the calculated Guidelines range of 0 to 6 months.

At the Second Sentencing Hearing, this variance was discussed in terms of a departure. While the result may be the same, there is a difference between a variance and a departure. "A 'departure' is typically a change from the final sentencing range computed by examining the provisions of the Guidelines themselves. . . ."[28] A departure is also subject to strict notice and procedural requirements. The Fourth Circuit has established a five-step analysis for determining whether a departure is warranted. A district court must (1) "determine the circumstances and consequences of the offense of conviction"; (2) "decide whether any of the circumstances or consequences of the offense of conviction appear 'atypical,' such that they potentially take the case out of the applicable guideline's heartland"; (3) identify each factor that

---

[25] *Gall v. United States*, 552 U.S. 38, 47 (2007).
[26] *United States v. Booker*, 543 U.S. 220, 260–262 (2005).
[27] *Id.*
[28] *United States v. Rangel*, 697 F.3d 795, 801 (9th Cir. 2012).

may remove a case from the heartland as either a "forbidden," "encouraged," "discouraged," or "unmentioned" basis for departure; (4) determine if those factors are already considered by the applicable sentencing guidelines; and (5) determine if the identified factors warrant a departure.[29]

"A 'variance,' by contrast, occurs when a judge imposes a sentence above or below the otherwise properly calculated final sentencing range based on the application of the other statutory factors in 18 U.S.C. § 3553(a)."[30] I write now to clarify that the sentence that I imposed was a variance, not a departure, from the advisory Guidelines range.

The Government's Motion for a Departure is indicative of the Government's insistent adherence to the Sentencing Guidelines and a reluctance to accept the holding of *Booker*. *Booker*, a case 15 years old at this point, made clear that the Sentencing Guidelines are no longer binding on the sentencing judge and that a departure is no longer necessary to impose a sentence above or below the advisory Guidelines range. While I did not go through the process for granting a departure on the record, the requirements and standards for granting a departure did inform my decision to *vary* from the advisory Guidelines range. I ultimately granted the Government's Motion for an Upward Departure because I already intended to vary upward from the Guidelines range. I believe that my reasons, discussed below, for varying upward are consistent with the Government's intention behind its Motion for Departure.

### a. Statement of Reasons for Sentence Imposed

---

[29] *U.S. v. Rybicki*, 96 F.3d 754, 757–759 (4th Cir. 1996).
[30] *Rangel*, 697 F.3d at 801; *see generally Departures and Variances*, United States Sentencing Commission (March 2020).

When imposing a sentence, I must consider the sentencing factors laid out in 18 U.S.C. § 3553(a). Section 3553(a) requires that I consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established for the applicable category of offense committed by the applicable category of defendant . . .; (5) any pertinent policy statement issued by the Sentencing Commission . . .; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

In my decision to impose a sentence of 60 months, I was being pulled in two directions. I was being pulled toward a shorter term of imprisonment by Defendant's personal history and the nature of the offense of conviction. At the same time, I was being pulled toward a lengthier sentence by the fatal consequences of Defendant's relevant conduct.

Defendant is a young mother of two. She had no criminal history points, and she was legitimately employed for most of her adult life. A defendant with a legitimate employment history and no criminal history points is far more rare than it should be. While no longer the case, she began dealing heroin to fuel her own methamphetamine addiction. And then there is the small amount of fentanyl[31] that

---

[31] Defendant has maintained throughout the proceedings that she believed she was distributing heroin rather than fentanyl.

Defendant stands convicted of distributing—0.1271 grams. All of this together might support a sentence within the calculated Guidelines range of 0 to 6 months.

But other aspects of Defendant's conduct led me to find to that a Guidelines sentence was insufficient. Defendant was aware of the dangers of heroin and it is clear that she lacked empathy for the people she sold drugs to. She stated that she had witnessed her own mother and sister succumb to heroin addiction and knew the harm it could do to individuals and families. She insisted that she had never and would never use heroin herself because she rightly feared the effects of an overdose or addiction. She also had not used methamphetamine in some time before being arrested for this offense; her motivation for selling heroin had turned from fueling her own addiction to profit. She was reckless and indifferent to the people she was harming by fueling their addictions. She acted with an atypical disregard for the known consequences of a deadly overdose. She stated that she knew what she was doing was wrong and that it made her feel bad, but that she continued to sell heroin because if she did not, then people would just go buy it somewhere else.

And her indifference had consequences. I found by a preponderance of the evidence that Defendant's conduct was the cause of Frederick Lawson's death. And after there had been a death that she knew was attributable to the drugs she was selling, she continued to sell the same drugs, even to people she knew personally.

As I have already stated on the record, I recognize that this not a case of a big player in an international cartel, but it is not only the drug lords that we need to stop and deter. We must also deter the dealers who deal recklessly and with indifference to the consequences of what they do. Deadly consequences in the drug business do not require a movie-style bad guy. It only takes a 22-year-old kid recklessly—and

22

with great indifference to human life—selling a stamp of what she may well have thought was heroin, a known controlled substance, but was in fact, fentanyl. Her actions led to the death of a friend; somebody she had lived with before.

In considering all of this, I found that a sentence within the Guidelines range of 0 to 6 months was insufficient to deter her or others from the same conduct, insufficient to promote respect for the law, and insufficient to protect the public from this type of conduct. A sentence of 60 months is appropriate.

A sentence of 60 months, rather than a Guidelines range sentence, reflects the seriousness of this offense, which resulted in the death of her friend. 60 months in prison followed by a 3-year term of supervised release will serve as a just punishment for Defendant's continued sale of this dangerous substance into her own community even after she knew that her drugs had contributed to Mr. Lawson's death. This sentence of 60 months will also better serve to deter criminal conduct from others than a Guidelines range sentence would. The sentence of 60 months "is sufficient, but not greater than necessary" to promote respect for the law and reflect the seriousness of the offense. 18 U.S.C. § 3553(a).

## V. Conclusion

The court **DIRECTS** the Clerk to send a copy of this explanation to the defendant and counsel, the United States Attorney, the United States Probation Office, and the United States Marshal. The court further **DIRECTS** the Clerk to post a copy of this published opinion on the court's website, www.wvsd.uscourts.gov.

ENTER:          December 17, 2020

JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE

23